# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| Gary Thurmond Jr. and Carolyn Thurmond; Hortensia Martinez; and Roel Garcia | § § § § | **C.A. No.: 2:19-CV-00034** |
| individually and on behalf of all others similarly situated, | § § § § | |
| **Plaintiffs** | § § § | **AMENDED COMPLAINT FOR DAMAGES, INJUNCTIVE RELIEF, AND RULE 23 CLASS ACTION FOR VEHICLE DAMAGES** |
| vs. | § § § | |
| voestalpine Texas Holding LLC and voestalpine Texas LLC | § § § | |
| **Defendants** | § § § | **JURY DEMANDED** |

## AMENDED COMPLAINT FOR DAMAGES AND
## INJUNCTIVE RELIEF, AND RULE 23 CLASS ACTION FOR VEHICLE DAMAGES

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiffs—Gary Thurmond Jr. and Carolyn Thurmond; Hortensia Martinez; and Roel Garcia —bring this action individually for themselves against Defendants—voestalpine Texas Holding LLC ("voestalpine Holding") and voestalpine Texas LLC ("voestalpine Texas")—for permanent injunctive relief and damages to their motor vehicles suffered as a result of Defendants' operations and activities at Defendants' direct reduction facility located in San Patricio County, Texas and Nueces County, Texas ("the La Quinta Plant").

## I.
## OVERVIEW

1.1    Plaintiffs bring their state law causes of action as owners of motor vehicles in San Patricio County, Texas, and Plaintiffs have incurred damages as a result of Defendants' operations and activities at the La Quinta Plant.

1.2     Specifically, Defendants own and operate the La Quinta Plant in San Patricio County, Texas and Nueces County, Texas. The La Quinta Plant converts pre-processed iron oxide pellets into highly metallized iron in the form of Hot Briquetted Iron (HBI).

1.3     The La Quinta Plant became fully operational on April 1, 2017. Almost immediately, Plaintiffs began noticing a fine layer of black dust[1] covering their vehicles in San Patricio County, Texas.

1.4     As a result of Defendants' intentional, negligent, and/or grossly negligent conduct, each Plaintiff has been subjected to negligence and trespass—permanent and/or temporary—and has suffered actual damages including the reasonable and necessary cost to restore their vehicles and/or the diminution in value of their properties, and each Plaintiff is entitled to exemplary damages for Defendants' grossly negligent conduct.

1.5     Should Plaintiffs' damages be determined to have resulted from an ongoing or permanent trespass, Plaintiffs are entitled to seek injunctive relief to stop the trespasses from continuing in the future. And the Court has the discretion to issue a permanent injunction to prevent Plaintiffs from continuing to suffer injury from permanent trespasses.

1.6     Plaintiffs further pray that this Court certify a Rule 23 class action to allow Plaintiffs and the Class Members to recover the damages to their vehicles caused by Defendants.

## II.
## THE PARTIES

### A.     Plaintiffs

2.1     Gary Thurmond Jr. and Carol Thurmond are Texas citizens residing in Portland, San Patricio County, Texas.

---

[1] What a layman may view as dust (solid particles and liquid droplets found in the air) may be more specifically identified as particle pollution or particulate matter—"PM" for short or "$PM_{10}$" or "$PM_{2.5}$" when referencing particulate matter of a certain size. As used in this complaint, dust refers to PM.

2.2     Hortensia Martinez is a Texas citizen residing in Portland, San Patricio County, Texas.

2.3     Roel Garcia is a Texas citizen domiciled in Gregory, Texas.

2.4     Plaintiffs and the Class Members are individuals that own or possess motor vehicles within the Bay Ridge Subdivision in Portland, Texas, or within the city of Gregory since April 2017 through the final disposition of this matter, and have incurred damages to those vehicles as a result of Defendants' operations and activities at the La Quinta Plant.

**B.     Defendants**

2.5     Defendant voestalpine Texas Holding LLC ("voestalpine Holding") is a limited liability company whose sole member—voestalpine Stahl GmbH—is an Austrian company having exclusively Austrian citizenship; thus, voestalpine Holding has Austrian citizenship.

2.6     Defendant voestalpine Texas LLC ("voestalpine Texas") is a limited liability company whose sole member—voestalpine Holding—has exclusively Austrian citizenship; thus, voestalpine Texas has Austrian citizenship.

**III.**
**JURISDICTION & VENUE**

**A.     Subject Matter Jurisdiction**

3.1     This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) over the claim of each and every Plaintiff against Defendants because complete diversity of citizenship exists between each Plaintiff—none of whom has Austrian citizenship—and each Defendant—both of whom have Austrian citizenship. Further, the amount is controversy for the claim of each and every Plaintiff against Defendants exceeds $75,000, exclusive of interest and costs. Specifically, each Plaintiff seeks actual and exemplary damages from Defendants exceeding $75,000, exclusive of interest and costs.[2]

---

[2] The property damage of married couples or other-co-owners bringing suit based on their joint ownership of the same vehicle is necessarily aggregated.

3.2     This Court also has jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregated amount in controversy exceeds five million dollars ($5,000,000.00), exclusive of interest and cost, the class comprises at least 100 members, and a member of a class of plaintiffs is a citizen of a State different from any defendant. 28 U.S.C. §§ 1332(d)(2) and (6). The Class Members, in total, own thousands of vehicles, each of which will require repair costs exceeding $5,000 to fix the damage caused by Defendants.

3.3     This Court has supplemental jurisdiction over all the state law claims and causes of action asserted pursuant to 28 U.S.C. §1367(a).

**B.     Personal Jurisdiction**

3.4     The Court has personal jurisdiction over Defendants because both are registered to do business in Texas and have registered agents in Texas, because they purposely availed themselves of the privilege of conducting activities within Texas, because both have substantial and continuous contacts with the State of Texas, generally and with respect to this action, to satisfy both general and specific personal jurisdiction, and because exercising jurisdiction over them does not offend the traditional notions of fair play and substantial justice.

**C.     Venue**

3.5     Venue is proper in the Southern District of Texas because this is a judicial district where a substantial part of the events or omissions giving rise to the claim occurred.

3.6     Specifically, the La Quinta Plant made the basis of Plaintiffs' claims is located in San Patricio County, Texas and Nueces County, Texas, both of which are located within this District and Division.

3.7     Venue, thus, is proper here pursuant to 28 U.S.C. § 1391(b).

## IV.
## FACTS

**A.    Defendants**

4.1    The voestalpine Group ("voestalpine") is a steel-based technology and capital goods group and a world leader in the manufacture, processing, and development of sophisticated steel products.[3] voestalpine supplies technology-intensive sectors, such as the automotive, railway, aviation, and energy industries.[4]

4.2    Defendant voestalpine Texas LLC ("voestalpine Texas") is the local presence of the voestalpine Group in South Texas and a 100% subsidiary of voestalpine AG.[5]

4.3    Upon information and belief, voestalpine Holding and voestalpine Texas share common officers and directors.

4.4    Upon information and belief, voestalpine Holding and voestalpine Texas share common ownership.

4.5    Upon information and belief, voestalpine Holding and voestalpine Texas were set up for voestalpine AG's Texas operations, including the operation of the La Quinta Plant.

4.6    Upon information and belief, voestalpine Holding and voestalpine Texas operate with little to no distinction among themselves as separate entities.

4.7    Both voestalpine Texas and voestalpine Holding control and are responsible for the operation of the La Quinta Plant, and the following portions of this Complaint will refer to them collectively as "voestalpine Texas."

---

[3] *See* http://www.voestalpine.com/texas/en/Company.

[4] *Id.*

[5] *See* http://www.voestalpine.com/texas/en/Company/voestalpine-Texas-LLC.

### B. The La Quinta Plant

4.8     The La Quinta Trade Gateway in San Patricio County is the home of voestalpine's direct reduction facility ("the La Quinta Plant").[6] The La Quinta Plant is located on Corpus Christi Bay and covers an area of almost 500 acres (approx. 2 square kilometers).[7]

4.9     The La Quinta Plant is voestalpine's largest foreign direct investment and purportedly a major step in achieving a low-carbon economy.

4.10     The La Quinta Plant converts pre-processed iron oxide pellets into highly metallized iron in the form of Hot Briquetted Iron (HBI) for use in the production of steel at other locations.

4.11     Iron is a reactive metal, which means that it may chemically react with other substances that it comes into contact with.

4.12     At the La Quinta Plant, voestalpine Texas receives iron oxide pellets, converts them to iron pellets, and then presses then into iron briquettes; these processes inevitably emit dust containing metallic particulate matter, mostly iron, into the air—including from the top of the Plant's reformer main flue ejector stack, which stands 137 meters (450 feet tall).

4.13     voestalpine Texas stores the raw, intermediate, and final iron-containing products in piles at the La Quinta Facility; these piles inevitably emit dust containing metal particulate matter, mostly iron, into the air.

4.14     voestalpine Texas claims that the layout of the La Quinta Plant is "designed with our neighboring communities and the environment in mind. The application of best available emission control technologies, the construction of berms and buffer zones and the creation of artificial shallow

---

[6] *See* http://www.voestalpine.com/texas/en/Project/The-Site.

[7] *Id.*

water habitats ensures that this state-of-the-art facility will have no adverse effect on neighboring communities, fauna and flora."[8]

4.15    Indeed, voestalpine Texas claims to be individually accountable and collectively responsible by and through the following:

> We will operate in a way that is safe for the community and our employees.

> We will engage in and honest and open dialogue and respond quickly and fully to questions.

> We will provide the community a Project update on a regular basis through a range of communications channels

> We will strive to minimize our environmental footprint. We are committed to protecting water resources and the existing flora and fauna.

> We will provide opportunities for local businesses to maximize the La Quinta Plant's local content

> We will maximize opportunities for local employment and training by working with government and regional educational and training institutions.[9]

**C.    Even before building the La Quinta Plant, voestalpine Texas knew that it would be a major source of dust containing reactive metal particles in the area, expected its operations to emit over 100 tons of that dust per year, and knew that the prevailing winds in the area would blow that dust onto homes and vehicles in Portland, Texas, including Plaintiffs' vehicles.**

4.16    voestalpine Texas, though its agents, first sought to obtain air permits from the Texas Commission of Environmental Quality (TCEQ) for its La Quinta Plant in 2013; at that time, the construction of the La Quinta Plant had not begun.

4.17    voestalpine Texas needed air permits because, among other reasons, the La Quinta Plant would constitute a new and major source of particulate air pollution in the area.

---

[8] *Id.*

[9] See http://www.voestalpine.com/texas/en/Community.

4.18    Specifically, in its initial air permit application, voestalpine Texas represented that the La Quinta Plant would emit 101.54 tons per year of total suspended particulates ("TSP"/PM) from 20 different emission points within the facility, including 76.95 tons per year of $PM_{10}$ (PM 10 microns[10] or less in diameter) and 67.93 tons per year of $PM_{2.5}$ (PM 2.5 microns or less in diameter size).

4.19    voestalpine Texas further represented that a significant portion of these emissions (32.46 tons per year of $PM/PM_{10}/PM_{2.5}$) would be emitted from its 450-foot-tall reformer main flue ejector stack.

4.20    With regard to wind, voestalpine Texas knew and represented that the La Quinta Plant would lie in an area where the wind speed exceeded 12 miles per hour at least 50% of the time, and that the area experienced strong south and southeast winds.

4.21    In sum, voestalpine Texas intended that the La Quinta Plant would be, and it inevitably became, a significant source of dust containing metal particulate matter, mostly iron, in the area.

4.22    voestalpine Texas also knew, before construction, that dust released by operations at La Quinta Plant would be picked up by the wind and transported onto nearby homes and vehicles in Portland, Texas, including Plaintiffs' vehicles.

**D.    voestalpine Texas was able to begin operations at the La Quinta Plant only upon the conditions that it cover the piles of iron ore pellets and not interfere with the normal use and enjoyment of property by anyone, including Plaintiffs.**

4.23    Before beginning operations at the La Quinta Plant, on March 1, 2016, voestalpine Texas obtained final approval from TCEQ of the air permits, as modified. Among other things, the permits—## 108113 and PSDTXT1344M1—required the following:

"Iron ore pellets shall be stored in enclosed storage" (Special Condition #17 on page 4).

---

[10] A micron is one millionth of a meter. An average human hair is roughly 70 microns in diameter, and an average grain of fine sand is about 90 microns in diameter.

"This facility shall not create a nuisance as defined in 30 TAC § 101.4 as adopted by the TCEQ. If such a condition does occur, additional controls maybe required." (Special Condition #22 on page 4).

4.24    The TCEQ defines as nuisance in the following manner:

No person shall discharge from any source whatsoever one or more air contaminants or combinations thereof, in such concentration and of such duration as are or may tend to be injurious to or to adversely affect human health or welfare, animal life, vegetation, or property, or as to interfere with the normal use and enjoyment of animal life, vegetation, or property.

30 TAC § 101.4.

**E.    Construction of the La Quinta Plant went over budget by $270,000,0000, and voestalpine Texas began operations with no regard for the residents and vehicles in Portland and Gregory, Texas, including Plaintiffs' vehicles.**

4.25    According to voestalpine's 2016-17 Annual Report, voestalpine initially budgeted $742 million for the La Quinta Plant. By the time the La Quinta Plant was done however, the Plant cost $1,012 million.[11]

4.26    Desperate to recoup its expanded budget as fast as possible, voestalpine Texas began limited operations at the La Quinta Plant in 2016.

4.27    voestalpine Texas' conduct blatantly disregarded the conditions under which it was supposed to operate the La Quinta Plant, including covering the piles of iron ore and incorporating dust control equipment and measures sufficient to prevent trespass conditions. By way of example, prior to becoming fully operational, testing of the main reformer flue stack showed that PM emissions exceeded the permitted levels by several times (at least 400%). voestalpine Texas, however, commenced operations knowing with substantial certainty that the La Quinta Plant would emit iron PM that would trespass on and damage Plaintiffs and the Class Members' vehicles \. Just prior to becoming fully operational, stack testing showed that the La Quinta Plant's main reformer stack was

_____

[11]    *See* http://www.voestalpine.com/group/static/sites/group/.downloads/en/publications-2016-17/2016-17-annual-report.pdf.

emitting PM at levels several times higher than permitted; voestalpine commenced full operations anyways.

**F.    When the La Quinta Plant became fully operational in April 2017, it—as voestalpine Texas knew it would—began emitting tons of dust containing reactive, magnetic particles that rained down on nearby homes and vehicles, including Plaintiffs' vehicles.**

4.28    The La Quinta Plant became fully operational on April 1, 2017.[12] Almost immediately, Plaintiffs began noticing a fine layer of black dust (particulate matter) covering their vehicles.[13]

4.29    voestalpine Texas referred to the particulate matter that Plaintiffs and Portland residents began noticing on their properties in April 2017 as the "black material" in a June 1, 2017 press release.[14]

4.30    Contrary to voestalpine Texas' representations, a fly-over on May 28, 2017, confirmed that the iron oxide pellet storage was not covered at the La Quinta Plant.[15]

4.31    Before June 7, 2017, voestalpine Texas represented to the public that the "black material" was from "temporary" operations conducted at the La Quinta Plant.

4.32    On June 7, 2017, a fly-over confirmed that the iron oxide pellet storage was still not covered at the La Quinta Plant.[16]

---

[12] *See* http://www.voestalpine.com/group/en/media/press-releases/2017-05-10-voestalpine-direct-reduction-plant-in-texas-fully-operational-since-april-1-2017/.

[13] *See* http://www.kristv.com/story/35456555/portland-residents-concerned-about-black-dust-on-homes.

[14] *See* http://www.voestalpine.com/texas/en/News.

[15] https://www.youtube.com/watch?v=oBPNNCpwxBk.

[16] *See* https://www.youtube.com/watch?v=P-jjusmPnv8&sns=em.

4.33    The "black material" is particulate matter originating from voestalpine Texas' operations at the La Quinta Plant, including without limitation the storage and/or processing of iron-oxide pellets, iron pellets, and iron briquettes.

4.34    The "black material" includes particulate matter from both point sources and fugitive sources at the La Quinta Plant. Point sources originate from definite locations, such as stacks and vents. Fugitive sources originate from broader areas, such as material storage piles and material unloading operations.

4.35    The "black material" is comprised of substantial amount of particles containing metal, mostly iron, and such particles are magnetic and reactive.

4.36    The "black material" is magnetic.

4.37    The "black material" has metallic properties.

4.38    The "black material" is subject to corrosion and oxidation.

4.39    The "black material" can (and does) cause rust.

4.40    As a result, particulate matter originating from operations at the La Quinta Plant may appear red in addition to black, and Plaintiffs have seen reddish particulate matter on their vehicles that originated from the La Quinta Plant.

4.41    The "black material" sticks to real and personal property.

4.42    The "black material" oxidizes metals that it touches. It may penetrate the top coat of paint, such as the clear coat of an automobile, and damage the underlying paint after being exposed to the "black material" for only a matter of days.

4.43    The "black material" is easily tracked inside, where it can become airborne and get sucked an air conditioning system.

4.44    At all material times, voestalpine Texas has known that particulate matter released from the La Quinta Plant would have, and continues to have, the above-described characteristics.

4.45    Plaintiffs have suffered, and continue to suffer, from the damaging "black material," including without limitation one or more of the above-described effects.

4.46    In April 2017, dust containing metal particulate matter, mostly iron, originated from operations at the La Quinta Plant.

4.47    In April 2017, dust containing metal particulate matter, mostly iron, landed on vehicles in Portland, Texas, including Plaintiffs' vehicles.

4.48    In Portland, Texas, in April 2017, the only significant source of dust containing metal particulate matter, mostly iron, was the La Quinta Plant.

4.49    In April 2017, "black material" was released from the La Quinta Plant and landed on vehicles in Portland, Texas, including Plaintiffs' vehicles.

4.50    Since becoming fully operational in April 2017, the La Quinta Plaint's operations have continuously produced dust containing metal particulate matter, mostly iron.

4.51    voestalpine Texas cannot produce or store HBI at the La Quinta Plant without emitting dust containing metal particulate matter, mostly iron.

4.52    In Portland, Texas, since April 2017, the only significant source of dust containing metal particulate matter, mostly iron, has been voestalpine Texas' operations at the La Quinta Plant.

4.53    In contrast to the metallic, mostly iron, dust emitted from operations at the La Quinta Plant, the natural soils in the area of the Plant and Portland, Texas, have very low iron content.

**G.    The deluge of "black material" falling onto homes and vehicles in Portland, Texas, from the La Quinta Plant once it became fully operational resulted in a flood of 141 complaints to the TCEQ, whose preliminary investigation found voestalpine Texas had created nuisance conditions and violated its air permits and TCEQ rules and regulations.**

4.54    Between May 16 and October 13, 2017, TCEQ received 141 complaints from citizens in the Portland, Texas, community regarding metallic, magnetic particles on their properties from the La Quinta Plant.

4.55    TCEQ conducted on site investigations of these complaints from May 16 to October 16, 2017, to determine if nuisance conditions were occurring, to identify the source upon detection, and to determine if operations were conducted in compliance with TCEQ rules and regulations.

4.56    TCEQ took samples from outside material stockpiles the La Quinta Plant. Laboratory testing showed that the materials were magnetic and mostly metal (over 80%), with iron being the predominant metal. The materials sampled at the La Quinta Plant were reddish to black in color.

4.57    TCEQ took samples of the complained of magnetic dust from various residences, and laboratory testing confirmed that it contained significant amounts of metal particles (over 80% of some samples), with iron being the predominant metal. The dust was reddish to black in color, and its composition was consistent with the materials sampled at the La Quinta Plant.

4.58    voestalpine Texas admitted that—beginning on February 17, 2017—it had started storing iron ore pellets outside and uncovered in violation of its air permits. As of June 6, 2017, voestalpine Texas had at least five outside storage piles containing iron ore pellets and 20 unauthorized storage piles—weighing from 35 to 95,000 metric tons—of iron ore pellets, fines, chips, sludge, and remet.

4.59    During the investigation, at a time when it had received only 139 complaints, TCEQ emailed voestalpine Texas that TCEQ had verified all 139 complaints to have iron dust on their properties. TCEQ also took a 30 second tape lift sample from a complainant's backyard downwind of the La Quinta Plant which indicated the presence of metal particles. That sample, plus citizen collected evidence, showed that iron ore dust consistent with the materials at the La Quinta Plant was continuously impacting citizens' properties.

4.60    TCEQ was able to rule out facilities other than the La Quinta Plant as the source of the metallic dust complained of.

4.61    In its preliminary report—based on its own investigation and information provided by citizens and voestalpine Texas—the TCEQ concluded that voestalpine Texas had failed to prevent nuisance dust conditions due to the iron dust from the La Quinta Plant interfering with the nearby residents' normal use and enjoyment of their properties and had committed multiple violations of its air permits and TCEQ rules and regulations.

4.62    Subsequent TCEQ investigations have reached the same conclusions, confirmed TCEQ's preliminary report, and found that the La Quinta Plant is still emitting excess PM and trespassing on Plaintiffs' property.

**H.    voestalpine Texas has witnessed and tested first-hand the "black material" released from the La Quinta Plant and onto the homes and vehicles in Portland, Texas, including Plaintiffs' vehicles; and voestalpine Texas has accepted responsibility for the "black material."**

4.63    voestalpine Texas' employees and agents have seen the "black material" stick to people's homes in Portland, Texas.

4.64    voestalpine Texas' employees and agents have seen the "black material" stick to people's vehicles in Portland, Texas.

4.65    voestalpine Texas' employees and agents have personally viewed the "black material" in swimming pools in Portland, Texas.

4.66    voestalpine Texas' employees and agents have personally viewed the "black material" in dog bowls in Portland, Texas.

4.67    voestalpine Texas' employees and agents have personally viewed the "black material" in air conditioning units in private homes in Portland, Texas.

4.68    voestalpine Texas' employees and agents have personally viewed the "black material" inside people's homes in Portland, Texas.

4.69     voestalpine Texas' employees and agents have personally viewed the "black material" inside people's garages in Portland, Texas.

4.70     voestalpine Texas has set up a hotline for persons to call who have been affected by the "black material" from the La Quinta Plant to obtain assistance in cleaning and repairing damaged property.

4.71     voestalpine Texas has accepted responsibility for creating the "black material."

4.72     voestalpine Texas has agreed to pay for property damage caused by the "black material" in Portland, Texas.

4.73     voestalpine Texas has offered chemical or "acid bath" car washes to those persons with vehicles affected by the "black material."

## V.
## CAUSES OF ACTION

### A.     Negligence and Negligence *Per Se*

5.1     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

5.2     voestalpine Texas' conduct has subjected, and continues to subject, Plaintiffs to unreasonable discomfort and annoyance,  that is, discomfort and annoyance that is unreasonable to a person of ordinary sensibilities attempting to use and enjoy the person's property.

5.3     Owners and possessors of vehicles in the Bay Ridge Subdivision in Portland and the city of Gregory—including Plaintiffs—were foreseeable victims of voestalpine Texas' operations at the La Quinta Plant.

5.4     voestalpine Texas owed a legal duty to act as a reasonably prudent landowner and operator of the La Quinta Plant.

5.5 voestalpine Texas's various acts or omissions which constitute negligence and/or negligence *per se*, include, but are not limited to, the following:

5.5.1 failing to adopt, implement, follow and/or enforce proper procedures for operations at the La Quinta Plant;

5.5.2 failing to adopt, implement, follow and/or enforce proper procedures for dust control at the La Quinta Plant;

5.5.3 failing to put in place reliable equipment and/or processes at the La Quinta Plant to prevent the release of the "black material" and other potentially damaging particulates;

5.5.4 failing to adopt, implement, follow, and/or enforce proper procedures for the inspection and maintenance of dust control equipment and processes at the La Quinta Plant;

5.5.5 failing to properly inspect and maintain the dust control equipment and processes at the La Quinta Plant;

5.5.6 failing to exercise reasonable care in the operations occurring at the La Quinta Plant;

5.5.7 failing to perform, implement, follow, and/or enforce proper hazard analysis at the La Quinta Plant;

5.5.8 operating the La Quinta Plant with institutional with ignorance and in defiance of a culture of safety and accountability at the La Quinta Plant;

5.5.9 causing and/or permitting to be caused the release of significant amounts of the "black material" from the La Quinta Plant and onto the nearby communities;

5.5.10 failing to train employees at the La Quinta Plant in the proper procedures for testing, evaluating, monitoring, recording, and/or documenting particulate matter emissions;

5.5.11 failing to train employees in the proper procedures for dust control at the La Quinta Plant;

5.5.12 operating the La Quinta Plant without appropriate and trained staffing and supervision;

5.5.13 operating the La Quinta Plant with equipment and processes that fail to comply with reasonable engineering, industry, and regulatory practices;

5.5.14 accepting and encouraging deviation from appropriate direct reduction and dust control procedures at the La Quinta Plant;

5.5.15   failing to implement, follow, enforce and train regarding proper dust control analysis and procedures at the La Quinta Plant;

5.5.16   failing to maintain a reliable and adequate equipment and processes at the La Quinta Plant for the prevention of unreasonable emissions of particulate matter at the La Quinta Plant;

5.5.17   consciously reducing costs and staffing at the La Quinta Plant at the expense of safety;

5.5.18   failing to adopt proper operating procedures at the La Quinta Plant;

5.5.19   failing to comply with proper operating procedures at the La Quinta Plant;

5.5.20   failing to adopt, implement, and comply with procedures for the proper supervision of operations and dust control at the La Quinta Plant;

5.5.21   ratifying and approving improper and inadequate operating and dust control procedures, routines, and practices at the La Quinta Plant;

5.5.22   violating Texas law (including without limitation, the Texas Clean Air Act, Chapter 382 of the Texas Health and Safety Code, Chapter 7 of the Texas Water Code, and TCEQ rules and orders promulgated under these statutes) which are intended to protect the health and safety of the public—including Plaintiffs—by regulating plant operations, emissions and the reporting of toxic chemical emissions, releases; and

5.5.23   engaging in such other acts and omissions which may be discovered through discovery and presented at trial regarding the La Quinta Plant.

## B.   Trespass

5.7   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

5.8   voestalpine Texas trespassed, and continues to trespass, on Plaintiffs' vehicles. Without the consent or authorization of Plaintiffs, voestalpine Texas caused—and continues to cause—the "black material" that originates at the La Quinta Plant to be deposited on Plaintiffs' vehicles.

5.9   voestalpine Texas' trespasses have caused, and continue to cause, Plaintiffs to suffer actual and substantial damages.

5.10    voestalpine Texas' trespasses on Plaintiffs' properties were, and continue to be, intentional or, alternately, negligent.

5.11    voestalpine Texas' trespasses on Plaintiffs' properties were, and continue to be, permanent. Alternately, they were and continue to be temporary.

## C.    Gross Negligence

5.12    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

5.13    voestalpine Texas was, and continues to be,  grossly negligent, as defined by Section 41.003 of the Texas Civil Practice & Remedies Code. Its conduct involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others. voestalpine Texas had actual and subjective awareness of the risks to owners of vehicles in Portland, Texas (including Plaintiffs) associated with operations at the La Quinta Plant and the inevitable emission of tons of "black material," but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others—including Plaintiffs. This gross negligence was a proximate cause of the "black material" falling on and damaging Plaintiffs' vehicles as well as Plaintiffs' resulting damages.

## VI.
## DAMAGES

## A.    Actual Damages

6.1    As a result of voestalpine Texas' conduct as alleged herein, Plaintiffs have suffered and continue to suffer damages to their motor vehicles.

6.2    Such damages include without limitation the past and future reasonable costs necessary to restore their vehicles to the conditions they were in prior to the occurrences in question.

**B.      Exemplary Damages**

6.3      Because voestalpine Texas is guilty of gross negligence, it should have punitive damages assessed against it and awarded to Plaintiffs in an amount deemed appropriate by the jury.

**C.      Pre-judgment and Post-Judgment Interest**

6.4      Plaintiffs seek pre-judgment and post-judgment interest at the maximum legal rate.

## VII.
## INJUNCTIVE RELIEF

**A.      Injunctive Relief is Necessary and Proper**

7.1      The Court has the discretion to prevent or minimize the future damages of Plaintiffs by granting injunctive relief. It would be grossly unfair for mass polluters such as Defendants to be able to issue a check and effectively obtain a license to continue harming Plaintiffs. Thus, Plaintiffs seek permanent injunctive relief against Defendants because Defendants' tortious conduct has caused them to suffer ongoing, irreparable injury and damages which only injunctive relief can put a stop to.

7.2      Plaintiffs are being harmed by excessive particulate matter emissions from the La Quinta Plant which are being deposited onto their vehicles and causing cosmetic damages resulting in increased maintenance costs and depreciation of property.

7.3      The voestalpine pollution that is causing harm is fine particulate matter (PM2.5) that is being released from stacks and exacerbated by excessive air pollution discharges from the La Quinta Plant's cooling tower and flare.

7.3.1      95% of the particulate matter emissions from the La Quinta Plant are from point sources (stacks). Defendants have focused attention on promoting control of fugitive emissions from their materials handling operations, claiming these actions show that they do a good job in controlling their air pollution. Instead, Defendants should have been focusing on controlling stack emissions. Air emissions from elevated point sources (stacks) are

responsible for damages caused to Plaintiffs' properties which are up to three miles away. The density of the particulate matter is nearly nine times greater than water. It is both common sense and well established in the scientific and industry literature that fugitive emissions generally tend to settle out close to emission sources, especially metal-based particles that are this dense.

7.3.2    Nearly 97% of the particulate matter discharged to air is PM2.5 or fine particulate matter. Since nearly 95% of these particles are released from elevated stacks at high temperatures, they are transported by atmospheric winds up to three miles away. When they settle out of the atmosphere, they agglomerate onto the surfaces of Plaintiffs' properties. Since the agglomerated particles contain a high percentage of iron, they scratch surfaces such as those on vehicles. Further, the particles are subject to corrosion and cause other metal surfaces that they land on to rust.

7.3.3    87% of the PM2.5 emissions from the plant are from the Reformer Main Flue Ejector Stack. This is the largest point source polluter. Defendants do not monitor these emissions using modern sensors, and their process is unstable. The La Quinta Plant uses continuous emissions monitoring (CEM) to track CO (Carbon Monoxide), $NO_x$ (Nitrogen Oxides) and $SO_2$ (Sulfur Dioxide) emissions, because it is required under its Title V permit. The CEM data for these pollutants show wide swings in these gaseous emission rates, which indicates that the La Quinta Plant does not always operate in a stable manner. It does not apply CEM to monitor or control particulate matter emissions. It is common sense that—if other pollutants like CO, $NO_x$ and $SO_2$ show wide fluctuations due to Defendants' failure to carefully control the process—the particulate emissions are also highly variable and not being controlled. Defendants' engineers recommended using PM CEM (Particulate Matter Continuous Emissions Monitor) to gain process control data which control discharges from

the Reformer Main Flue Ejector Stack and ensure stable operation of the plant. However, senior management rejected this recommendation to save money and conceal information from the TCEQ.

7.3.4    Defendants rely on opacity monitoring to monitor particulate emissions from stacks using Visible Emissions-Method 9s. It specified this method as a basis to monitor and control its particulate emissions in its Title V permit. Stack tests performed by third-party consultants show that, despite Visible Emissions-Method 9s observed opacity recording to be within limits, the mass emission rates for dusts are three to five times above allowable rates stated in the Title V permit. Defendants recognized the inaccuracy of the monitoring method it specified in its Title V permit application which is why it chose this method over PM CEM. Defendants' wanted to avoid having to do continuous compliance of its particulate emissions.

7.3.5    The basis by which the facility was permitted under the Title V permit was wrong. Defendants obtained the permit by representing that all of its particulate emissions are filterable particles. They were issued a permit based on air modeling that was performed for filterable particulate matter. Stack tests performed by third-party consultants on the Reformer Main Flue Ejector Stack report that 70% of the total particulate matter released are condensable solids. This means that the largest polluting source's emissions (87% of the plant's total PM2.5 air discharges) are actually 70% greater than the emission rate Defendants used in an air dispersion model for permitting purposes. It also means that the reported emissions to the TCEQ are under reported. Defendants now propose to petition the TCEQ for a higher emission rate for EPN29 (Reformer Main Flue Ejector Stack). Rather than controlling air emissions, Defendants want the TCEQ to write them a blank check to continue polluting; the consequence would be to cause permanent harm to Plaintiffs.

7.3.6   EPN33 (the La Quinta Plant's Cooling Tower) has multiple violations of excessive particulate emissions which is due to the equipment as built having a higher flowrate and cooling water TDS (Total Dissolved Solids) than its original design basis. Instead of fixing the problem, Defendants intend to petition the TCEQ for a Title V permit modification to allow them to continue polluting at levels above the current allowable emission rates as established in its original Title V permit. Defendants refuse to fix their design mistakes and bring the source into compliance; as a consequence, Plaintiffs will be subjected to permanent harm.

7.3.7   EPN38 (the La Quinta Plant's Flare) has multiple violations which have resulted in excessive emissions of particulates, $NO_x$ and VOCs (Volatile Organic Compounds). The TCEQ reports excessive pollution levels due to the Plant needing a continuous pressure vent on the reformer to maintain pressure at a level that was not permitted. Again, because of Defendants' design mistakes and failure to taking the effort to improve control of their processes, Defendants intend to seek a permit modification to allow them to pollute at rates well above the current allowable emission rates established in its Title V permit and cause permanent harm to Plaintiffs.

7.3.8   Records show multiple exceedances/violations of the current Title V permit in which operators are derelict in performing daily and weekly monitoring of emissions for multiple sources. Failure to perform diligent monitoring means that the La Quinta Plant is allowing emissions to be released uncontrolled and not taking corrective actions to reduce them. Defendants have not taken their obligation to meet good environmental performance seriously and have an ineffective environmental management system.

B.     **Injunctive Relief to Prevent Plaintiffs' Future Vehicle Damages**

7.4     Plaintiffs respectfully request that the Court order Defendants to take the following corrective actions to reduce emissions at the La Quinta Plant:

7.4.1     Install PM CEM (particulate matter continuous emissions monitoring) to track the dust from the Top Gas Wet Scrubber Duct which has a profound contribution to the Reformer Main Ejector Stack particulate emissions. Defendants' engineers knew this should have been done in 2016, but senior management elected not to adopt the tool. If they had installed this technology they would have had improved control over the primary pollution control for the plant (the scrubber), been able to run the plant with fewer upsets which leads to episodic releases and would have prevented harm to Plaintiffs. Defendants do not intend to reduce the PM emissions from EPN29 (Reformer Main Ejector Stack), but rather apply for a permit modification to increase the allowable emission rate for this source in its Title V Permit. This is unacceptable because Plaintiffs will continue to face permanent loss of enjoyment of their property and ever increasing maintenance costs due to damages caused by particulate deposition. The use of PM CEM will provide operators with real time particulate loading measurements to the reformer and stack bypass which can be used to adjust feed rates to the process, process pressure (which impacts flaring) and residence times that have first order effects on emissions. There is some concern that installing PM CEM in the Top Gas Wet Scrubber could cause harm to the sensor because of severe temperatures. Testing will have to be performed along with consultation of the supplier(s) of this instrument. If this is an operating restriction then PM CEM can be installed on EPN29 (Reformer Main Flue Ejector Stack) which has less severe temperatures. This will give less precise data but sufficient information to assess process stability. This data should be reported on a regular basis to the TCEQ so that it may assess operating upsets that constitute exceedance of the Title V permit and citizen complaints. Parametric testing and final installation should be performed within

three months of signed relief. This is more than adequate time to identify a suitable vendor that can assist the defendant in performing in-line testing and specifying the final monitoring configuration.

7.4.2    Perform continuous emissions monitoring and only rely on the use of opacity monitors for spot checking and troubleshooting. Defendants want to operate under the radar screen of the TCEQ. They should not be allowed to be in compliance only part of the time but should be required to be in compliance all of the time. Opacity monitoring is insensitive and incapable of identifying fine particulate matter emission levels which are causing harm. Defendants should instruct, train and require operators to monitor with PM CEM. Defendants should screen all point sources for their contribution to plantwide TSP (Total Suspended Particulates) air discharges and have a third-party consultant recommend which additional source beyond EPN29 are best controlled using CEM. This assessment should not take more than one month. The consultant should provide a technical report with recommendations on any additional sources that can be better controlled by CEM monitoring. Based on the consultant's recommendations, the La Quinta Plant should be allotted an additional two months to install improved monitoring instrumentation and instructions for operators.

7.4.3    Install a CCTV system (closed circuit television system) to monitor yard and material handling operations. This will strengthen the facility's use of DustTrak monitors. Defendants should establish stop work programs for situations of excessive fugitive emissions on dry, dusty days. The La Quinta Plant should install a meteorological station and use meteorological records in conjunction with CCTV monitoring to plan work schedules so that fugitive dusts are kept to a minimum. These actions will ensure nuisance dusts are minimized

for Plaintiffs in close proximity to the facility. This corrective action should be immediately implemented.

7.4.4    Utilize an EMIS (Environmental Management Information System) and have a third-party consultant devise specific metrics that enable it to track deviations and episodic releases as well as schedule corrective actions. The La Quinta Plant suffers a high frequency of recurring events which are the cause of episodic particulate emissions. Examples include failure to perform daily and weekly monitoring, failure to perform maintenance in a timely manner, failure to record flow rates needed for mass balances for emissions, among others. By tracking these and other appropriately defined metrics such as maintenance turnaround times as an example, deviations and exceedances will be reduced over time. The EMIS should be linked to the internal email system of the facility so that environmental managers, technicians and operators better communicate and schedule corrective actions that improve environmental performance. EMIS software tools are well recognized as a management tool to schedule permit renewals, schedule maintenance, track emissions over time and as a basis to evaluate overall environmental performance. A commercial software package including on-site staff training should be implemented within one month of the injunctive relief.

7.4.5    Engage a cooling tower specialist to evaluate the high emissions from EPN33 and implement a program to reduce them. Violations have resulted from excessive PM emissions due to limitations of the hardware. Defendants have informed the TCEQ that the cooling tower as built operates in a manner that was not intended based on its original design. Instead of the La Quinta Plant correcting the problem through better control of the TDS (Total Dissolved Solids) and blowdown optimization, the Plant's approach has been to submit a permit modification to request an increase in allowable emissions from the source. A cooling tower optimization study guided by specialists will result in recommended optimum blowdown

and recycle rates and recommendations of surfactants and electrolytes that will lower TDS. The specialist may also recommend some internal modifications such as demisters and baffles which will reduce particulate emissions. There are multiple companies that specialize in this service. This corrective action will require vendor recommended on-site testing of the cooling tower. Based on past experience, it should not take more than two months for the evaluation and another one month to implement corrective actions to reduce emissions to within the current Title V permit.

7.4.6    Devise and implement a flare minimization plan (FMP). The La Quinta Plant has excessive flare emissions. EPN38 (flare) has more than 100 deviations (violations for excess air emissions). The emissions from the flare are largely VOCs and NO$_x$, but they contribute to the nuisance because they form acid aerosols which create nucleation and condensation sites that capture metal particulates released from the Plant, thereby exacerbating particle deposition on to Plaintiffs' properties. Defendants intend to submit a permit modification to increase allowable emissions from this source. In other words, they intend for the nearby community to be subjected to permanent levels of higher pollution because of their design mistakes. The FMP will need to address operating limits for the Plant. The Plant is operating at higher pressures than the design basis specified. To address this, the Plant may have to consider reducing the loadings to the reformer and production volumes. Plant tests will need to be performed in conjunction with the use of PM CEM in the Top Gas Wet Scrubber Duct and or the Reformer Main Ejector Stack in order to establish stable operating conditions for the Plant and recommendations for the technical requirements of the FMP. It is recommended that the Plant be given six months to perform testing and develop a formal FMP which should be reviewed and approved by the TCEQ.

7.4.7    Perform additional air modeling accounting for condensable particulate matter. The air model simulations need to assess lower plant production volumes that support particle deposition approaching levels that the plant was originally issued a permit for. Defendants' current approach is to simply petition the TCEQ to raise its allowable emission rates. Current production volumes and poor operations are causing harm to Plaintiffs. The air dispersion modelling simulations will establish an operating window in terms of Plant production volumes that will allow the Plant to operate without causing harm. Defendants have sufficient data from both stack tests, production records and the TCEQ field tests to establish an acceptable operating window. Defendants should be required to review its findings with the TCEQ for its guidance on restricting either operating times or production volume that will reduce impacts to Plaintiffs. They should be required to complete this evaluation within four months. At that time, the Plant and the TCEQ will have a definitive basis for establishing revisions/modifications to the Title V permit.

7.4.8    Implement the principles of the ISO 14000 Environmental Management System standards for environmental managers and Plant personnel, which will focus their efforts on continual improvement of environmental performance. The Plant should engage a third-party auditor and apply for ISO 14001 registration. This will improve its compliance record, which is dismal.

7.4.9    Construct and maintain a web site documenting Defendants' actions, investments and progress towards improving the environmental performance of the La Quinta Plant. Defendants should be transparent with ]regulators, the Court, counsel, Plaintiffs, and the community. Responsible companies that place their environmental performance at the same level of priority as financial bottom line routinely communicate with the public to show their commitment to sustainability and good environmental performance.

# VIII.
## VEHICLE CLASS ALLEGATIONS

### A.     Class Definition

8.1     Plaintiffs brings this class action on behalf of themselves and all other persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.

8.2     The Class which the Plaintiffs seek to represent is adequately ascertainable, objectively verifiable, and is defined as:

> **ALL NATURAL PERSONS OWNING OR POSSESSING A MOTOR VEHICLE AND RESIDING WITHING THE BAY RIDGE SUBDIVISION IN PORTLAND, TEXAS, OR THE CITY OF GREGORY, TEXAS, FROM APRIL 1, 2017 THROUGH THE FINAL DISPOSITION OF THIS MATTER.**

8.3     Excluded from the Class(es) are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class(es) are any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

8.4     This class action is appropriate because it satisfies all prerequisites of Federal Rule of Civil Procedure 23(a), and is shown as follows:

### B.     Numerosity

8.5     The Class is so numerous that joinder of all members is impracticable. On information and belief, Defendants have damaged tens of thousands of vehicles in San Patricio County, Texas as a result of the emissions from the Project. *See* FED. R. CIV. P. 23(a)(1); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) ("A class consisting of 100 to 150 members is within the 'range that generally satisfies the numerosity requirement.'")

8.6     While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery. The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and the Court.

**C.     Commonality**

8.7     There are questions of law and fact common to Plaintiffs and the Class Members, and those questions substantially predominate over any questions that may affect individual Class Members. *See* FED. R. CIV. P. 23(a)(2).

8.8     Common questions of law and fact include, but are not limited to, the following:

8.8.1     Whether Defendants negligently acted or failed to act;

8.8.2     Whether Defendants' acts or omissions amount to gross negligence;

8.8.3     Whether Defendants' acts or omissions caused contaminants to enter the atmosphere;

8.8.4     Whether Defendants' acts or omissions resulted in contaminants entering the atmosphere causing Plaintiffs and the Class Members to suffer damage to their vehicles;

8.8.5     The mechanisms by which PM emissions from the La Quinta Plant reached and damaged the vehicles of Plaintiffs and the Class Members;

8.8.6     Whether Plaintiffs and the Class Members have a remedy under substantive federal law for the wrongs complained of;

8.8.7     Whether Plaintiffs and the Class Members have a remedy under substantive state law for the wrongs complained of;

8.8.8     Whether Plaintiff and the Class Members sustained damages and are entitled to compensation as a consequence of Defendants' acts or omissions, and, if so, what is the proper measure and appropriate formula to be applied in determining such damages and compensation;

8.8.9     Whether exemplary damages should be awarded to Plaintiff and the Class Members, and the amount that is appropriate under the law; and

8.8.10     Whether, and in what amount, attorneys' fees and costs should be

awarded to Plaintiffs and the Class Members.

8.8.11   Whether the Court should issue injunctive relief to prevent future injury and damages to Plaintiffs and the Class Members that, in reasonable probability, they would suffer in the future as a result of Defendants' tortious conduct.

## D.     Typicality

8.9     The claims of Plaintiffs are typical of the claims of the Class Members. *See* FED. R. CIV. P. 23(a)(3).

8.10     Plaintiff and the Class Members have been similarly affected by Defendants' common course of conduct because they have all been damaged by Defendants' misconduct in that they have all incurred similar or identical losses relating to damage to their vehicles. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members. The remedy for such injury and damage is also the same.

## E.     Adequacy of Representation

8.11     Plaintiffs will fairly and adequately protect the interests of the Class Members. *See* FED. R. CIV. P. 23(a)(4).

8.12     There are no conflicts of interest between Plaintiffs and the Class Members. Additionally, the undersigned attorneys are financially able to prosecute the action to the fullest extent of the law.

## F.     Superiority of Class Action

8.13     This class action is appropriate pursuant to Federal Rule of Civil Procedure 23(b)(3) because class treatment is a superior method to ensure the fair and efficient resolution of this controversy and all issues of law and fact are identical amongst the class members. *See* FED. R. CIV. P. 23(b)(3).

8.14    Allowing the litigation to proceed on a class wide basis is in the Class Members' best interest because many of their claims are comparatively modest—based on vehicle damage only—thereby rendering litigation outside of the class context both expensive and burdensome.

8.15    Finally, should a Class Member prefer to move forward individually, they are free to follow the opt-out procedure and do so. Therefore, the Class Member's interests are best served by this collective treatment and this factor favors certification. *See* FED. R. CIV. P. 23(b)(3)(A).

8.16    Resolving Plaintiff and the Class Members' claims together in this forum is the most efficient and effective possible outcome.

8.17    There are no difficulties in managing this as a class action. There is no greater difficulty in resolving this as a Rule 23 class action. Therefore, this factor also favors certification. *See* FED. R. CIV. P. 23(b)(3)(D).

## IX.
## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs have demanded a trial by jury of any and all issues in this action so triable of right and paid the jury fee.

## X.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that this cause be set for trial before a jury, that the Court enter judgment against Defendants that grants the following relief:

A.    that Plaintiffs recover judgment of and from Defendants, jointly and severally, for their actual (past and/or future) and exemplary damages in such amounts as the evidence may show and the jury may determine to be proper, together with the costs of suit, pre-judgment interest and post-judgment interest, attorney fees, and for all such other

and further relief, both in equity and at law, including injunctive relief, to which Plaintiffs may show that they are justly entitled; and

B.     that Plaintiffs' claims for damages resulting from damage to their vehicles be certified as a class action, that the undersigned be appointed as class counsel, that appropriate notice be directed to the class, and that Plaintiffs and the Class Members recover their actual (past and/or future) and exemplary damages in such amounts as the evidence may show and the jury may determine to be proper, together with the costs of suit, pre-judgment interest and post-judgment interest, attorney fees, and for all such other and further relief, both in equity and at law, to which Plaintiffs and the Class Members may show that they are justly entitled.

Dated: March 4, 2020                     Respectfully submitted,

**ANDERSON ALEXANDER, PLLC**

By:     /s/ Clif Alexander
        Clif Alexander
        Federal I.D. No. 1138436
        Texas Bar No. 24064805
        clif@a2xlaw.com
        Austin W. Anderson
        Federal I.D. No. 777114
        Texas Bar No. 24045189
        austin@a2xlaw.com
        819 N. Upper Broadway
        Corpus Christi, Texas 78401
        Telephone: (361) 452-1279
        Facsimile: (361) 452-1284

**LILES WHITE PLLC**

By:     /s/ Stuart R. White
        Stuart R. White
        Federal I.D. No. 11448833
        Texas Bar No. 24075268
        stuart@lileswhite.com

Kevin W. Liles
Federal I.D. No. 21501
Texas Bar No. 00798329
kevin@lileswhite.com
500 N. Water Street, Suite 800
Corpus Christi, Texas 78401
Telephone: (361) 826-0100
Facsimile: (361) 826-0101

**FRAZER PLC**

By:    /s/ T. Roe Frazer II
       T. Roe Frazer II (Admitted *Pro Hac Vice*)
       Tennessee Bar No. 35785
       roe@frazerlaw.com
       1 Burton Hills Blvd., Suite 215
       Nashville, Tennessee 37215
       Telephone: (615) 647-0990

**ATTORNEYS IN CHARGE FOR PLAINTIFFS
AND THE CLASS MEMBERS**


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on March 4, 2020, I electronically filed the foregoing document with the

clerk of the court for the U.S. District Court, Southern District of Texas, using the electronic case

filing system of the court.  The electronic case filing system sent a "Notice of Electronic Filing" to the

attorneys of record who have consented in writing to accept this Notice as service of this document

by electronic means.


        /s/ Clif Alexander
       Clif Alexander